UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

MASUDA KHAN,

                          Plaintiff,                    **MEMORANDUM & ORDER**
                                                        14-CV-4260 (MKB)

            v.

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

       Plaintiff Masuda Khan filed the above-captioned action seeking review, pursuant to 42

U.S.C. § 405(g), of a final administrative decision of the Commissioner of Social Security (the

"Commissioner") denying her claim for Social Security disability insurance benefits.  The

Commissioner moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules

of Civil Procedure, arguing that the decision of Administrative Law Judge John Barry (the

"ALJ") is supported by substantial evidence and should be affirmed.  (Comm'r Not. of Mot. for

J. on the Pleadings, Docket Entry No. 17; Comm'r Mem. in Support of Mot. for J. on the

Pleadings ("Comm'r Mem."), Docket Entry No. 18; Comm'r Reply Mem. in Support of Mot. for

J. on the Pleadings ("Comm'r Reply"), Docket Entry No. 21.)  Plaintiff cross-moves for

judgment on the pleadings, arguing that the ALJ (1) failed to accord Plaintiff's treating

physicians, Dr. Irena Espinar, M.D., and Dr. Euna Lee, M.D., appropriate weight, (2) lacked

substantial evidence for his assessment of Plaintiff's residual functional capacity ("RFC"),

(3) ignored evidence of Plaintiff's carpal tunnel syndrome, and (4) improperly allowed testimony

by telephone at the administrative hearing.  (Pl. Not. of Cross-Mot. for J. on the Pleadings,

Docket Entry No. 19; Pl. Mem. in Support of Cross-Mot. for J. on the Pleadings ("Pl. Mem."),

Docket Entry No. 20; Pl. Reply Mem. in Support of Cross-Mot. for J. on the Pleadings ("Pl. Reply"), Docket Entry No. 22.) For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted.

## I. Background

Plaintiff is a fifty-one-year-old woman who graduated high school prior to immigrating to the United States. (R. 36, 38.) Plaintiff last worked on July 17, 2011, as a supermarket cashier. (R. 182.) Plaintiff applied for disability benefits on September 29, 2011, with an alleged disability onset date of July 17, 2011. (R. 75, 128.) Plaintiff's application was denied on December 9, 2011, (R. 76), and she timely requested a hearing before an ALJ, which was held on November 30, 2012,[1] (R. 30). On April 15, 2013, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 16–26.) Plaintiff sought review of the ALJ's decision by the Appeals Council. (R. 14.) On June 25, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1–3.)

### a. Plaintiff's testimony

Plaintiff last worked at Pathway Supermarket as a cashier, but stopped working there due to problems with her right knee, which made her unable to stand. (R. 37.) Plaintiff's right knee caused her constant pain, and, when asked to rate her pain on a scale of one to ten, with ten being the highest, she rated her pain as an eight or nine. (R. 42, 46–47.) Plaintiff has osteoporosis and osteoarthritis, causing her bones to be like those of an eighty-year-old. (R. 42.) She also has

---

[1] The ALJ held a hearing on June 12, 2012, which was adjourned until Plaintiff retained counsel. (R. 70–74.)

pain from mild carpal tunnel syndrome in her right wrist, and she wears a splint prescribed by her doctor. (R. 55–56.) She experiences numbness in her hand when it is resting, and her doctor has recommended surgery for her wrist. (R. 55–56.)

Plaintiff's knee pain sometimes prevents her from sleeping. (R. 45.) Plaintiff spends most of the day in bed, in order to elevate her leg. (R. 54.) She watches television but can read for only a short period of time, as the pain prevents her from concentrating. (R. 55.) Plaintiff cannot walk in a straight line, and she walks with a cane. (R. 41–42.) With the assistance of a cane, Plaintiff can walk two or three blocks and stand for a half-hour. (R. 47.) She has difficulty sitting, because it causes pain from her right hip down to her knee.[2] (*Id.*) Plaintiff also has difficulty manipulating things like knives, forks and cups with her right hand when it is in a splint. (R. 55.)

Since 2010, Plaintiff has seen Dr. Evan Schwarz every month. (R. 40, 175.) Dr. Schwarz told Plaintiff that her knee could collapse at any time, and that she needed a knee replacement, however, she has not yet scheduled an appointment for the surgery. (R. 39–40.) Because of the potential for a knee collapse, Dr. Schwarz instructed Plaintiff not to go outside alone or stand for too long. (R. 39.) Plaintiff has received at least one cortisone injection from Dr. Schwarz.[3] (R. 41.)

Plaintiff's rheumatologist, Dr. Euna Lee, diagnosed Plaintiff's osteoporosis and osteoarthritis, and found that Plaintiff had very low levels of vitamin D. (R. 42–43.) Dr. Lee

---

[2] During her testimony, Plaintiff had to elevate her leg to alleviate the pain. (R. 54.)

[3] Plaintiff, who is a non-native English speaker, first testified that she received a cortisone injection "one time in a life," but then stated "three cortisone injections." (R. 41.)

prescribed Plaintiff a vitamin D supplement.[4]  (R. 43.)  Plaintiff also takes meloxicam and

Fosamax for her osteoporosis.  (R. 43–44.)  Dr. Lee limited Plaintiff from picking things up and

"carry[ing] more than two pounds" due to her osteoarthritis.  (R. 42, 49.)  If Plaintiff lifts more

than two pounds she will lose her balance.  (R. 48–49.)  Plaintiff can sit for no longer than a half-

hour.  (R. 47–48.)

Plaintiff leaves her house approximately once each week, "just to go outside for a walk."

(R. 51.)  When she goes elsewhere, she uses the bus to get around.  (R. 49.)  Plaintiff's friends

and relatives visit her because she cannot visit them.  (R. 52.)  Plaintiff sometimes goes grocery

shopping and cooks, but only for herself.  (R. 49–50.)  Plaintiff sometimes cleans her house, but

her son or her husband does her laundry because she cannot.  (*Id.*)

### b.  Plaintiff's work history

Plaintiff worked as a grocery store cashier from May of 1992 until sometime in 1996.

(R. 182, 190.)  From November of 1998 until February of 1999, Plaintiff worked part-time at the

post-office as a letter separator.  (R. 182, 184, 190.)  From November of 1999 until July 17,

2011, Plaintiff worked as a cashier at a supermarket.  (R. 182–83, 190.)

### c.  Medical evidence

### i.  Queens Health Center

The record indicates that Plaintiff has been seen by a number of doctors from Queens

Health Center for knee problems and other ailments.  (R. 174–75.)  The administrative record

---

[4]  Plaintiff also takes Gabapentin for nerve-related issues that she could not specify.
(R. 44.)

includes medical records from some of these doctors,[5] which are detailed below.

### 1. Dr. Evan Schwartz

Since May of 2010, Dr. Evan Schwartz has treated Plaintiff every month for her knee pain. (R. 175.) In the course of his treatment, Dr. Schwartz gave Plaintiff two cortisol injections and a "synvisc-one injection," and he referred Plaintiff for a magnetic resonance imaging ("MRI") of her right knee, which occurred on July 22, 2011. (R. 175, 256–57.) The MRI revealed Plaintiff's osteoarthrosis, history of cartilage or meniscus tears, and chondromalacia of Plaintiff's patella. (R. 256.) It revealed "para-ACL ganglion type cysts posterior to the origin of the ACL on the lateral femoral condyle," and a minimal edema at the "posterior root attachment of the posterior horn of the medial meniscus." (*Id.*) The MRI also showed "tricompartmental osteoarthrosis," and cartilage loss that was "most marked" at the knee's medial compartment, in addition to a "subchondral cyst/edema" at the middle compartment, and a bowed medial collateral ligament. (*Id.*) Plaintiff's patella was centrally located "at the patellofemoral joint, without tilt and at normal height," and she had full thickness cartilage fissuring at the patella's lateral facet. (*Id.*) The ACL, PCL, lateral meniscus, collateral ligaments and extensor mechanism were intact. (*Id.*) The radiologist noted three impressions: (1) osteoarthrosis and cartilage loss most prominent at the medial compartment of the knee, (2) patella cartilage fissuring and edema, most marked at the lateral facet, and (3) minimal edema at the posterior

---

[5] On the Social Security Administration's ("SSA") "Disability Report – Appeal – Form SSA 3441," Plaintiff lists all of the doctors from Queens Health Center who have treated her, including: Dr. Franklin Caldera, a surgeon who followed up on Plaintiff's undisclosed abnormal biopsy and sonogram reports, (R. 174); Dr. Debra Guthrie, an ophthalmologist who Plaintiff sees every six months due to a family history of cataracts, (*id.*); Dr. Lawrence Schechter, a doctor who examined Plaintiff for a sonogram and biopsy, (R. 174–75); and Dr. Claudette Troyer, a dermatologist who treated spots and itches associated with pain in Plaintiff's knees and legs, (R. 175). No records from these doctors are in the administrative record.

root attachment of the posterior horn of the medial meniscus, but no evidence of meniscal tear intersecting an articular surface or displaced meniscal fragments. (R. 256–57.)

## 2. Dr. Irena Espinar

Plaintiff was seen by Dr. Irene Espinar, M.D., multiple times in 2010, 2011 and 2012. (R. 299, 309.) Dr. Espinar completed a "Physician's report for claim of disability due to physical impairment," which is dated November 20, 2012. (R. 309–14.) Dr. Espinar first treated Plaintiff on August 11, 2010. (R. 309.) Plaintiff complained of knee pain and a decreased range of motion beginning in 2010. (*Id.*) Dr. Espinar noted that Plaintiff had been seen by a rheumatologist and an orthopedist, both of whom recommended a total right knee replacement. (*Id.*) Dr. Espinar found that knee crepitus[6] had decreased the knee's range of motion. (R. 310.)

Dr. Espinar referred Plaintiff for imaging of her hip, knee and lumbar spine several times in 2011 and 2012. (R. 299–304, 310.) On April 19, 2011, Plaintiff underwent X-rays of her lumbar spine and left hip. (R. 303–04.) The lumbar spine X-ray revealed osteoporosis and Plaintiff was classified as having a "high" risk of fracturing her lumbar spine.[7] (R. 303.) The hip X-ray revealed osteopenia and that Plaintiff had an "increased" risk of fracture. (R. 304.)

Dr. Espinar discussed the results of a July 22, 2011 MRI of Plaintiff's right knee in her November 20, 2012 report. (R. 310.) Dr. Espinar indicated that the MRI revealed osteoarthrosis and cartilage loss "most prominent at the medial compartment" of Plaintiff's knee. (*Id.*) Patella cartilage fissuring and edema was "most marked" at the lateral facet, and there was minimal

---

[6] "Crepitus" refers to "the grating of a joint, often in association with osteoarthritis." *Crepitus*, *Stedman's Medical Dictionary* (28th ed. 2006).

[7] Handwritten notes on the results of the X-ray highlight Plaintiff's -3.2 "T-score" at her L4 spine, and notes separately, -5.0. (R. 299.)

edema "by the posterior root attachment of the posterior horn of the medial meniscus."[8]  (*Id.*)

Dr. Espinar referred Plaintiff for a second X-ray of her lumbar spine and left hip, which took place on June 5, 2012.  (R. 300–03.)  The X-ray of Plaintiff's lumbar spine revealed osteoporosis and a high fracture risk.  (R. 299.)  Plaintiff's left hip showed osteopenia, but lacked findings as to Plaintiff's fracture risk.  (R. 301.)

In her November 20, 2012 report, Dr. Espinar made a clinical finding that Plaintiff had knee crepitus and decreased range of motion.  (R. 310.)  Dr. Espinar also diagnosed Plaintiff as having right knee osteoarthrosis, mild right carpal tunnel syndrome and hyperlipidemia.[9]  She considered Plaintiff's condition chronic and recommended a total right knee replacement.  (*Id.*)  Dr. Espinar noted that Plaintiff's medical conditions could be expected to last twelve consecutive months.  (*Id.*)  She noted that Plaintiff needs to lie down for a "couple" hours during the day "due to pain in the [right] knee."  (*Id.*)  Dr. Espinar also noted that Plaintiff's right knee pain made it difficult to walk or sit.  (R. 311.)  Dr. Espinar recommended physical therapy, fifteen milligrams of meloxicam, ten milligrams of Fosamax and Neurontin and twenty milligrams of Zocor.  (*Id.*)  The report noted that none of these medications limited Plaintiff's activities, and

---

[8]  Dr. Espinar also referred Plaintiff for a computerized tomography ("CT") scan of her chest, which was completed on September 1, 2011.  (R. 264–65.)  The scan revealed an aberrant right subclavian artery.  (*Id.*)  Plaintiff's lung parenchyma showed no evidence of suspicious nodules or masses, and no evidence of interstitial lung disease.  (R. 264.)  Plaintiff's osseous structures, upper abdomen and adrenal glands were "without focal mass," (*id.*), and her upper abdomen lacked significant adenopathy, (*id.*).  Plaintiff was also found to be "status post cholecystectomy," due to her prior gallbladder surgery.  (R. 265.)

[9]  "Hyperlipidemia" refers to "[e]elevated levels of lipids in the blood plasma."  *Hyperlipidemia*, *Stedman's Medical Dictionary*.

the meloxicam was intended to decrease Plaintiff's pain.[10]  (*Id.*)

Dr. Espinar's September 1, 2012 report notes that Plaintiff had functional limitations as to various physical abilities.  (R. 311–14.)  According to Dr. Espinar, during an eight-hour workday, Plaintiff could sit, stand or walk for up to two hours.  (R. 311.)  Plaintiff could occasionally, frequently and continuously lift and carry up to five pounds, and occasionally lift and carry six to ten pounds.  (R. 312.)  Plaintiff could occasionally reach, but could not bend, squat, crawl or climb.  (*Id.*)  Dr. Espinar noted that Plaintiff could use her hands for simple gripping, pushing and pulling, and had arm control, but could not perform fine manipulations.  (R. 313.)  Plaintiff could use only her left foot for repetitive movements.  (*Id.*)  Dr. Espinar appears to note that Plaintiff had no restriction for activities involving unprotected heights, moving machinery, exposure to marked changes in temperature and humidity, or driving a motor vehicle, and had mild to no restrictions for exposure to dust, fumes and gases.  (*Id.*)  In addition, Plaintiff could travel alone by bus on a daily basis, but not by subway.  (R. 314.)

### 3.  Dr. Vikas Varma

Plaintiff indicated that her neurologist at Queens Health Center was Dr. Vikas Varma, M.D.[11]  (R. 175.)  Records from Neuro Pain Care, P.C. include results from an electro-diagnostic study of Plaintiff's motor and sensory nerves by Dr. Varma.  (R. 305–06.)  Dr. Varma found that the study revealed evidence of a "mild right carpal tunnel syndrome (median nerve entrapment at

---

[10]  On the SSA "Disability Report – Appeal" form, Plaintiff notes that Dr. Espinar prescribed her Naproxin, but because it was ineffective, Dr. Espinar referred her to Dr. Evan Schwartz.  (R. 174.)

[11]  On the SSA "Disability Report – Appeal" form, Plaintiff indicates that she first saw Dr. Varma in May of 2010, last saw him in November of 2011, and was scheduled for another visit in February of 2012.  (R. 175.)  According to Plaintiff, Dr. Varna attempted to treat her nerve pains with therapy, but it was not helpful.  Dr. Varma then referred Plaintiff to an orthopedic therapist.  (*Id.*)

wrist) affecting sensory and motor components."  (R. 305.)

### ii.  Dr. Euna Lee

Plaintiff's medical records include a social security medical assessment form completed by Plaintiff's rheumatologist, Dr. Euna Lee, M.D., and dated June 4, 2012.  (R. 292–96.)  Dr. Lee indicates that she had treated Plaintiff four times: August 11, 2010, January 5, 2012, January 26, 2012, and June 4, 2012, the day she completed the form.  (R. 292.)

### 1.  Medical assessment

Based on a July 22, 2011 MRI of Plaintiff's right knee, Dr. Lee diagnosed Plaintiff with osteoarthritis.  (R. 294.)  In her June 4, 2012 medical assessment, Dr. Lee diagnosed Plaintiff with osteoporosis and right knee osteoarthritis based on her objective clinical and laboratory findings that Plaintiff had right knee crepitus.[12]  (R. 292–93.)  According to Dr. Lee, these conditions cause Plaintiff constant knee pain and swelling, and decrease the knee's range of motion.  (*Id.*)  Dr. Lee noted that Plaintiff's condition causes difficulty walking and sitting due to pain and stiffness.  (R. 292.)  Given her objective medical findings, Dr. Lee found that Plaintiff's symptoms were "credible" and the impairment was expected to last "at least twelve months." (R. 294.)  Dr. Lee prescribed Plaintiff 15 milligrams of meloxicam along with physical therapy, but noted that Plaintiff's prognosis was "poor" because she had a chronic condition that was "unlikely" to "get better without surgery."  (R. 292–94.)  Dr. Lee also noted that a knee

---

[12]  Plaintiff's April 2011 and July 2012 X-rays of her lumbar spine and left hip are part of the same exhibit as Dr. Lee's notes.  (R. 292–304.)  It is unclear whether Dr. Lee referenced these X-rays in connection with her evaluation.  The Court notes that the June 5, 2012 X-ray occurred after Dr. Lee's June 4, 2012 medical summary.  (*Id.*)

replacement was recommended by Plaintiff's orthopedist.[13]  (R. 293.)

Dr. Lee noted that Plaintiff had multiple functional limitations.  In an eight-hour day, Plaintiff could sit for thirty minutes and "walk and stand" for thirty minutes.  (R. 295.)  Plaintiff could also sit for ten to fifteen minutes at a time and "walk and stand" for ten minutes at a time in an eight-hour work day.  (*Id.*)  Plaintiff could occasionally, frequently and continuously lift up to five pounds, and she could occasionally lift six to ten pounds.  (*Id.*)  Plaintiff could never lift more than ten pounds.  (*Id.*)  Plaintiff could occasionally reach, but could never bend.  (*Id.*)  Plaintiff could manipulate her hands, arms and fingers and use her feet to push and pull leg controls without limitations.[14]  (*Id.*)

### 2.   Physical capacity evaluation

On September 5, 2012, Dr. Lee completed a "Physical Capacity Evaluation."  (R. 308.)  Dr. Lee found that Plaintiff was limited in lifting and carrying, standing "and/or" walking, and sitting.  (*Id.*)  According to Dr. Lee, Plaintiff could occasionally lift and carry ten pounds up to a third of a work day.  (*Id.*)  Plaintiff could frequently lift and carry five pounds for one third to two thirds of a work day.  (*Id.*)  Plaintiff could stand up to two hours per day and walk less than one hour per day.  (*Id.*)  Plaintiff could sit less than two hours per day, and needed to "stand frequently to stretch before she can sit again."  (*Id.*)

### iii.   Dr. Iqbal Teli, M.D.

On or about November 30, 2011, Plaintiff underwent a consultative "internal medicine

---

[13]  Plaintiff indicated on the SSA "Claimant's Recent Medical Treatment" form that Dr. Lee recommended "another bone density [X]-ray" because Plaintiff's knee pain had increased. (R. 198.)

[14]  Dr. Lee found no limitations due to environmental conditions and observed no signs of mental illness.  (R. 296.)

examination" with Dr. Iqbal Teli, M.D., after a referral from the Division of Disability

Determination. (R. 278.) Plaintiff complained of having dull left hip pain for more than a year,

which radiated to the left leg with numbness and with "8/10" intensity. (*Id.*) Plaintiff also

complained of having dull lower back pain for more than a year, which radiated to the lower

extremities "bilaterally with numbness and rated "8 to 9/10 in intensity." (*Id.*) Plaintiff was

taking 500 milligrams of Naproxen for pain and seventy milligrams of Alendronate. (*Id.*)

Dr. Teli noted that Plaintiff did not appear to be in acute distress and had a normal gait

and stance. (R. 279.) Dr. Teli noted that outside the home, Plaintiff used a cane prescribed by

her doctor for balance. (*Id.*) Plaintiff could not walk on her heels and toes, and her squat was

limited to thirty percent due to her back pain. (*Id.*) Plaintiff needed no help changing for her

examination or in getting on and off the examination table, and was also able to rise form her

chair without difficulty. (*Id.*)

Plaintiff's cervical and lumbar spine showed full flexion, extension, lateral flexion

bilaterally and full rotary movement bilaterally. (R. 279–80.) Plaintiff showed no scoliosis,

kyphosis or abnormality in her thoracic spine. (R. 280.) Plaintiff's shoulders, elbows, forearms

and wrists had full range of motion bilaterally. (*Id.*) Plaintiff also had "5/5" strength in upper

and lower extremities. (*Id.*) Dr. Teli found no evidence of subluxations, contractures, ankylosis

or thickening. (*Id.*) Plaintiff's joints were stable and non-tender, and there was no redness, heat,

swelling or effusion. (*Id.*) Plaintiff's pain sensation was diminished in both legs. (*Id.*)

Dr. Teli reviewed X-rays of Plaintiff's lumbar spine and right hip joint, and concluded

that they were normal. (*Id.*) Plaintiff's lumbosacral spine X-ray showed that the height of the

vertebral bodies and intervertebral disc spaces was relatively well maintained, and the pedicles

are intact. (R. 282.) Plaintiff's right hip X-ray showed no evidence of acute fracture, dislocation

or destructive bony lesion, and her joint spaces were relatively well-maintained. (R. 283.)

Dr. Teli noted that Plaintiff's activities included cooking three times a week, cleaning and doing laundry once a week, showering twice a week and dressing each day. (R. 278.) Dr. Teli also noted that Plaintiff watched television and went on walks. (*Id.*) Dr. Teli diagnosed Plaintiff with a history of left hip pain, lower back pain and "status post gallbladder surgery," and found that Plaintiff had a moderate restriction for squatting. (R. 280.)

### iv. Other medical evidence

Plaintiff had a colonoscopy on July 29, 2010, conducted by Dr. Liberato Salvatore, M.D. (R. 218.) Dr. Salvatore identified internal hemorrhoids and tortuous sigmoid. (*Id.*) Plaintiff's records also include a computerized print-out, detailing various clinical tests and appointments from September 14, 2011 through September 28, 2011. (R. 268–69.) It is unclear who ordered these tests or examined Plaintiff at these appointments. (*Id.*) The records also include a report regarding "alkaline phosphatase isoenzymes," but does not include any explanation of the report's results or findings. (R. 261–62.) The records also reflect that Plaintiff had an eye test resulting in a prescription. (R. 263.)

Plaintiff was treated at Lenox Hill Hospital's emergency room on August 30, 2011. (R. 221.) Plaintiff complained that she had severe, "10/10" chest pain for the prior four days, and that the symptoms were intermittent. (*Id.*) The symptoms began when Plaintiff was engaged in "moderate activity," and she denied having any other symptoms. (*Id.*) Plaintiff's pain had a gradual increase in her chest in the "epigastric area," left abdomen and "left flank."[15] (R. 224.) A physical examination revealed Plaintiff's head was "normocephalic" and

---

[15] The Lenox Hill records list Plaintiff's past medical history of osteoporosis and gall bladder surgery. (R. 224.)

"atraumatic." (R. 226.) Her neck was "supple" and notes regarding her back state "mild TTP left CVA." (*Id.*) Plaintiff's abdomen had normal bowel sounds, and it was soft and non-distended, but notes indicate that it was tender the left upper and lower quadrants. (*Id.*)

At the hospital, Plaintiff underwent a computerized tomography ("CT") scan of her abdomen and pelvis, which revealed multiple lung nodules.[16] (R. 232.) Based on the scan, Plaintiff was noted as "status post cholecystectomy." (R. 232, 236.) Plaintiff's pelvis showed an inferior prolapse of the bladder between the vagina and rectum, which was "consistent with a cystocele." (R. 232.) Plaintiff's bowel showed "wall thickening of the jejunum without evidence of obstruction," and there were no "ascites" seen. (*Id.*) Based on the mildly thickened jejunal loops, the radiologist's notes indicated that the thickening could be related to "underdistention" and "enteritis" could also be considered. (R. 236.) Plaintiff had a "subcentimeter low-attenuation lesion" on her left kidney, which was "too small to characterize," and her right kidney was normal in appearance.[17] (R. 232.) Plaintiff's liver and pancreas appeared normal, and her adrenal glands were unremarkable. (*Id.*) The scan revealed no abdominal aortic aneurysm or lymphadenopathy, and the osseous structures were normal. (*Id.*) A CT scan of Plaintiff's chest was recommended for further evaluation.[18] (*Id.*) Upon discharge,

---

[16] There were four and five millimeter nodules on the left lower lobe, a six millimeter nodule on the right middle lobe and a three millimeter nodule on the right lower lobe. (R. 232.)

[17] Additional notes list the findings as "subcentimeter left renal cortical hypodensity. Mild prominence of the renal collecting." (R. 236.)

[18] In addition, a chest X-ray showed clear lungs and no "pleural effusions," and "bony structures" were intact. (R. 231.) An electrocardiogram also revealed a normal heart rate, "axis," "PR interval," "QRS interval" and "ST/T wave." (R. 237.)

Plaintiff was advised to follow up with "PMD" for CT scan results of her chest.[19]  (R. 238.)

### d.  Non-medical evidence

#### i.  Function reports

Plaintiff completed a "Function Report," detailing her activities and limitations, which is dated October 24, 2011.  (R. 138–50.)  During the day, Plaintiff cooked and walked for fifteen minutes, but cooked only the "easiest foods" daily because she could not stand for more than an hour.  (R. 139–40.)  Plaintiff could not clean or do laundry or household repairs, because she was unable to do anything for longer than a half-hour at a time.  (R. 141.)  She did not go out of her home alone because she could not balance on her leg at times, and did not drive because of hip and lower back pain.  (R. 142.)  She no longer sews because she cannot sit for more than an hour at a time.  (R. 143.)  Plaintiff could not lift more than ten pounds, or use her hands for more than an hour.  (R. 143–44.)  Plaintiff was being treated for pain by Dr. Espinar and Dr. Schwartz at Queens Health Center.  (R. 146.)  Plaintiff had a stabbing pain in her knee, hip and lower back, and standing, walking, sitting and climbing stairs caused her pain.  (R. 147.)  Among other things, Plaintiff received Synvisc-one once every six months and cortisone injections once each month.  (*Id.*)  Plaintiff completed a second "Function Report," dated November 8, 2011, reiterating the same information, but noting that she could not lift or stand at all.  (R. 150–61.)

---

[19]  Plaintiff indicated on the SSA "Claimant's Recent Medical Treatment" form that she was treated at Flushing Hospital Medical Center for a right breast mass "with needle localization," and underwent a right breast biopsy.  (R. 198.)  In addition, she noted on the same form and on the "Disability Report – Appeal" form that she had been treated by Dr. Franklin Caldera of Queens Health Center, who was the surgeon that followed up on her abnormal biopsy and sonogram reports.  (R. 174, 198.)  Plaintiff noted that she had been seeing Dr. Caldera since January 11, 2012, and that Dr. Caldera had asked that she schedule appointments with him every three months.  (R. 198.)  No records from Dr. Caldera appear in the administrative record.

###### ii. Physical RFC assessment

On December 8, 2011, "J. Niles" reviewed Plaintiff's medical file and completed a physical RFC assessment, diagnosing Plaintiff with osteoporosis of the lumbar spine and osteoarthrosis and "DJD" of her right knee. (R. 285–90.) Niles noted multiple exertional limitations, including Plaintiff's ability to (1) lift and/or carry twenty pounds occasionally and ten pounds frequently, (2) stand "and/or" walk with normal breaks for "about" six hours in an eight-hour workday, (3) sit with normal breaks for "about" six hours in an eight-hour workday, and (4) push "and/or" pull without limitation, other than those limitations for lifting and carrying. (R. 286.) Niles found postural limitations "secondary to" subjective low back, knee and hip pain, and that Plaintiff could only occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl. (R. 287.) Niles concluded that the totality of evidence in Plaintiff's file supported a RFC to perform "light" work and noted that Plaintiff could return to her past relevant work of cashier and similar types of work. (R. 290.)

In support of these findings, Niles noted:

> [Plaintiff] alleges left hip, right knee, and low back pain, and denied other medical conditions. Findings at the [consultative examiner] revealed a normal gait and not in acute distress. She used a cane, however gait was normal with or without it — and was deemed not medically necessary. Lumbar spine as well as hips had full [range of motion] with no evidence of subluxations, contractures, ankylosis, or thickening. Joints were stable and non-tender with no redness, heat, swelling, or effusion. DTRs were intact as well as strength, though there was diminished pain sensation in lower extremities but no specific neuro distribution noted. Lumbar and right hip x-rays were normal though a bone density test did reveal osteoporosis of the lumbar spine. MRI of right knee showed osteoarthrosis and cartilage loss most prominent at the medial joint compartment, however there was full [range of motion] and no other abnormal clinical pathology.

(R. 286.) The analyst found no manipulative or visual limitations, but noted postural limitations for climbing, balancing and stooping. (*Id.*)

### e. Vocational expert testimony

Vocational expert Christina Boardman testified by telephone.[20]  (R. 56–68.)  Boardman

testified that Plaintiff's job as a cashier was light work with an specific vocational preparation

("SVP") of "3."  (R. 63.)  The ALJ asked Boardman:

> [A]ssume the claimant can lift and carry less than 10 pounds
> frequently, 10 pounds occasionally.  Can sit for six hours in an
> eight hour workday.  Stand and walk for two hours in an eight hour
> workday.  There would be no climbing of ropes, ladders . . . and
> scaffolds, occasional climbing of ramps and stairs.  No balancing,
> stooping, bending, crouching, crawling or kneeling.  Would the
> claimant be able to do her past work?

(R. 63–64.)  Boardman testified that given such limitations, Plaintiff could not perform her past

work.  (R. 64.)  The ALJ followed up, asking Boardman:

> Assume a hypothetical individual the same age, education and
> work experience as the claimant with the same abilities and
> limitations as just stated.  Would there be jobs in the regional
> economy for such a hypothetical individual?

(*Id.*)  Boardman testified that there would be jobs available, specifically, work as a document

preparer or stem mounter, which are both sedentary work with an SVP of "2," in addition to

dowel inspector in the woodworking field, which was sedentary unskilled work with an SVP of

"2."  (*Id.*)  The ALJ presented another hypothetical, asking Boardman to assume the first

hypothetical person, but added that the hypothetical person "would be able to frequently finger

and handle small objects."  (R. 65.)  Boardman testified that the jobs would still be available to

---

[20]  Plaintiff's counsel was surprised that Boardman was appearing at the hearing by
telephone as he received no notice that Boardman would be testifying.  (R. 57.)  The ALJ
confirmed that the record contained only the resume of "Edna Clark," presumably another
vocational expert, and that Boardman's resume was not circulated before the hearing.  (*Id.*)
Counsel objected to Ms. Boardman testifying and to her doing so by telephone.  (R. 58.)  During
Ms. Boardman's testimony as to her qualifications, the parties had difficulty hearing Boardman's
answers through the telephone.  (R. 58–60.)  Plaintiff's counsel also objected to Boardman's
testimony because she was providing answers different than those given at an unrelated hearing.
(R. 61–62.)

such an individual. (*Id.*) When the ALJ added the need to be "off task" fifteen percent of the day for unscheduled breaks to lie down, Boardman stated that there would be no jobs available for such an individual. (R. 65–66.)

### f. ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the SSA under the authority of the Social Security Act. First, the ALJ found that Plaintiff had not engaged in substantial activity since July 17, 2011, the alleged onset date of her disability. (R. 21.) Second, the ALJ found that Plaintiff had the severe impairments of osteoarthritis and cartilage loss of the right knee, and status post cholecystectomy. (*Id.*)

The ALJ found that Plaintiff also had abdominal, neck and back pain, but determined that these impairments "did not cause more than minimal limitation" on Plaintiff's ability to perform basic work activities, and therefore they were not considered severe. (R. 21–22.) To support his finding that Plaintiff's abdominal pain lacked sufficient severity, the ALJ referenced the results of Plaintiff's July 2010 colonoscopy, which found hemorrhoids but was otherwise normal. (R. 21.) In addition, the ALJ noted that Plaintiff had undergone a CT scan of her abdomen and pelvis, which found thickening of the jejunum and a small cystocele, and that a physical examination revealed tenderness and a soft "non-distended abdomen." (*Id.*) The ALJ found no evidence of treatment for, or functional limitations from, the abdominal pain. (R. 21–22.)

The ALJ further noted that the bone density scans performed in April of 2011 revealed osteopenia in Plaintiff's neck and osteoporosis in her lumbar spine. (R. 22.) However, the ALJ found that the record contained no further evaluation of these results, or evidence of functional limitations. (*Id.*) The ALJ further noted that as to Plaintiff's back pain, a physical examination revealed only mild back tenderness, and X-rays of her lumbar spine revealed "no significant

bony abnormalities." (*Id.*) After giving "significant weight' to the imaging results, physical examinations and the absence of functional limitation findings, the ALJ concluded that Plaintiff's abdominal, neck and back pain did not cause more than minimal limitations to Plaintiff's ability to perform basic work activities and were therefore not severe impairments. (*Id.*)

Third, the ALJ determined that Plaintiff does not have an impairment, or combination of impairments, that meets or equals the severity of one of the listed impairments in Appendix 1 of the SSA Regulations. (*Id.*) The ALJ found that no medical source presented findings or opinions that Plaintiff's impairments, by themselves or in combination, equaled the criteria of any listed impairment. (*Id.*) The ALJ gave specific consideration to Section 1.02, pertaining to major dysfunction of a joint, and Section 1.04, pertaining to disorders of the spine. (*Id.*)

Fourth, the ALJ determined that Plaintiff "has the RFC to perform less than the full range of sedentary work." (*Id.*) Specifically, Plaintiff could "lift and carry ten pounds," and, in an eight-hour work day, could "sit for six hours" and "walk for two hours." (*Id.*) Plaintiff could occasionally climb ramps and stairs, but never ropes, ladders or scaffolds, and could never balance, bend, crouch, crawl or kneel. (*Id.*) The ALJ also found that Plaintiff's statements concerning "the intensity, persistence and limiting effects of these symptoms are not entirely credible" given the clinical findings, diagnostic results, and her "self-described activities." (R. 25.)

In reaching this conclusion, the ALJ considered Plaintiff's July 22, 2011 right knee MRI, revealing osteoarthrosis and cartilage loss, and Plaintiff's August 2011 abdomen and pelvis CT scan confirming Plaintiff's "status post cholecystectomy." (R. 23.) The ALJ accorded "significant weight" to the opinion of consultative examiner Dr. Teli, noting that he found that

Plaintiff's only functional limitation was her moderate restriction for squatting, which was consistent with his examination findings, diagnostics results, and was "from a source familiar with Social Security disability evidentiary requirements." (R. 24.)

The ALJ accorded "little weight" to the opinions of Dr. Lee and Dr. Espinar. (*Id.*) The ALJ referenced Dr. Lee's June and September of 2012 evaluations, noting that in June of 2012, Dr. Lee diagnosed Plaintiff with right knee osteoarthritis and osteoporosis and that Dr. Lee concluded that Plaintiff could sit, walk and stand for thirty minutes each in an eight-hour day, but sit for only ten to fifteen minutes at a time. (R. 23.) The ALJ further noted that Dr. Lee concluded in September of 2012 that Plaintiff could stand up to two hours, walk less than one hour and sit less than two hours. (R. 24.) He also noted Dr. Espinar's diagnoses of osteoarthritis, osteoporosis, mild right carpal tunnel syndrome and hyperlipidemia, and Dr. Espinar's findings that Plaintiff could sit for less than two hours, stand and walk up to two hours, and could never bend, squat, crawl or climb. (*Id.*) However, the ALJ accorded these opinions little weight because neither Dr. Lee nor Dr. Espinar "supplied any treatment notes or medical records to support" these functional capacity assessments.[21] (*Id.*)

Next, the ALJ determined that Plaintiff was unable to perform her past relevant work as a cashier, given her RFC to perform less than the full range of sedentary work. (R. 25.) At the fifth step, the ALJ evaluated Plaintiff's age, education, work experience and RFC together with the evidence presented by the vocational expert. (R. 25–26.) The ALJ concluded that there were a significant number of jobs in the national economy that Plaintiff could perform, specifically document preparer, stem mounter and dowel inspector, and therefore Plaintiff was not disabled.

---

[21] The ALJ stated that Plaintiff's attorney had an opportunity to produce these records "post hearing." (R. 24.)

(*Id.*)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Greek v. Colvin*, --- F.3d ---, ---, 2015 WL 5515261, at *3 (2d Cir. Sept. 21, 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act

is a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the Act. To be eligible for disability benefits under the Act, the plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. § 404.1520. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the

[Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).

### c. Analysis

The Commissioner moves for judgment on the pleadings, arguing that the ALJ's determination that Plaintiff was not disabled was supported by substantial evidence. Plaintiff cross-moves for judgment on the pleadings, arguing that the ALJ (1) failed to accord Plaintiff's treating physicians, Dr. Espinar and Dr. Lee, appropriate weight, (2) lacked substantial evidence for his assessment of Plaintiff's RFC, (3) ignored evidence of Plaintiff's carpal tunnel syndrome, and (4) improperly allowed telephonic testimony at the administrative hearing. For the reasons discussed below, the Court denies the Commissioner's motion for judgment on the pleadings, and grants Plaintiff's cross-motion for judgment on the pleadings.

### i. Treating physician rule and the duty to develop the record

Plaintiff argues that the ALJ erred in according little weight to the opinions of treating physicians Dr. Lee and Dr. Espinar, and asserts that the ALJ failed to develop the record supporting their opinions. (Pl. Mem. 1, 12–13.) The Commissioner asserts that the ALJ properly assigned Dr. Lee's and Dr. Espinar's opinions little weight because they lacked evidentiary support and were contradicted by the consultative physician's evaluation. (Comm'r Mem. 21.) According to the Commissioner, Plaintiff failed to produce any support for Dr. Lee and Dr. Espinar's opinions or seek assistance from the ALJ, whereas the ALJ made "reasonable efforts" to obtain the relevant medical records, and, under the SSA regulations, was not required to re-contact Dr. Lee or Dr. Espinar. (Comm'r Reply 3–4.)

A treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record."[22] 20 C.F.R. § 404.1527(c)(2); *see Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

An ALJ must consider a number of factors to determine how much weight to assign a treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors). The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion. *Halloran*, 362 F.3d at 32. While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of

---

[22] A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502; *see also Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)).  Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33.

However, before evaluating the weight assigned to a treating physician, the Court must assess whether the ALJ satisfied his threshold duty to adequately develop the record before deciding the appropriate weight of a treating physician's opinion.[23]  *Burgess*, 537 F.3d at 129 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."  (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *Collins v. Comm'r of Soc. Sec.*, No. 11-CV-5023, 2013 WL 1193067, at *9–10 (E.D.N.Y. March 22, 2013) (remanding for failure to develop the record); *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003) ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability . . . .  Until he satisfies this threshold requirement, the ALJ cannot even begin to discharge his duties . . . under the treating physician rule." (alterations in original) (quoting *Peed v. Sullivan*, 78 F. Supp. 1241, 1246 (E.D.N.Y. 1991))).  This duty to develop the record applies even when the claimant is represented by counsel.  *See Johnson v. Astrue*, 811 F. Supp. 2d 618, 629 (E.D.N.Y. 2011) (citing *Rosa*, 168 F.3d at 79, and *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

The SSA regulations mandate that an ALJ make "every reasonable effort" to obtain

---

[23]  The ALJ is "under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel."  *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (summary order).

evidence from a claimant's medical sources, requiring both an initial request and a follow-up request if evidence has not been received. 20 C.F.R. § 404.1512(d)(1) (2013). The ALJ's duty to develop the record does not cease where a source initially fails to produce relevant records. *Cf. Drake v. Astrue*, 443 F. App'x 653, 656 (2d Cir. 2011) (finding hospital's failure to provide part of record did not mean ALJ failed to exercise reasonable efforts to develop the record where ALJ had requested updated records from the hospital and "nothing in the record suggests that the ALJ should have known that [the hospital's] response was incomplete"). Even where an ALJ has made the required initial and follow-up requests, in certain circumstances, the ALJ may be required to re-contact a treating source in order to fulfill the ALJ's duty to develop the record. *See* 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c) (2013); *Gabrielsen v. Colvin*, No. 12-CV-5694, 2015 WL 4597548, at *5 (S.D.N.Y. July 30, 2015) (detailing the ALJ's duty to re-contact); *Rolon v. Comm'r of Soc. Sec.*, 994 F. Supp. 2d 496, 505 (S.D.N.Y. 2014) (remanding and directing the ALJ to re-contact the plaintiff's treating physician "to obtain clarification regarding the purportedly inconsistent findings").

The SSA regulations governing the ALJ's duty to re-contact a medical source were amended to make re-contacting an option for the ALJ, rather than a requirement. How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10651, 10651 (Feb. 23, 2012) (codified at 20 C.F.R. pts. 404 and 416). "The regulations that now control, 20 C.F.R. §§ 404.1520b(c)(1) and 416.920b(c), provide that re-contacting the treating physician is an *option* for correcting inconsistencies in the record, but that the ALJ 'may choose not [to] seek additional evidence or clarification from a medical source if [the ALJ] know[s] from experience

that the source either cannot or will not provide the necessary evidence.'"[24] *Gabrielsen*, 2015

WL 4597548, at *6. Nevertheless, although an ALJ may have the option to re-contact medical

sources, the Second Circuit has indicated that even under the revised 20 C.F.R. §§ 404.1520b, it

may be incumbent upon the ALJ to re-contact medical sources in some circumstances. *See*

*Selian*, 708 F.3d at 421.

In *Selian*, the consultative examiner's opinion, on which the ALJ relied, concluded that

the claimant could lift objects "of a mild degree of weight on an intermittent basis." *Id.* at 421.

The Second Circuit found this opinion "remarkably vague," and merely left things to the ALJ's

"sheer speculation." *Id.* Given the claimant's testimony to the contrary, "[a]t a minimum, the

ALJ likely should have contacted [the physician] and sought clarification of his report." *Id.*

(citing 20 C.F.R. § 404.1520b(c)(1)); *McClinton v. Colvin*, 2015 WL 5157029, at *23 (S.D.N.Y.

Sept. 2, 2015) ("In applying [20 C.F.R. § 416.920b(c)], . . . when the information needed pertains

to the treating physician's opinion, the ALJ should reach out to that treating source for

clarification and additional evidence."); *Gabrielsen*, 2015 WL 4597548, at *6 ("[C]ourts in the

Second Circuit have concluded, citing [40 C.F.R. §§ 404.1520b(c)(1), 16.920b(c)(1)], that the

ALJ still has an obligation to re-contact the treating physician in some cases." (citing *Selian*, 708

F.3d at 42, and *Ashley v. Comm'r of Soc. Sec.*, No. 14-CV-40, 2014 WL 7409594, at *4

(N.D.N.Y. Dec. 30, 2014))); *see also Vazquez v. Comm'r of Soc. Sec.*, No. 14-CV-6900, 2015

---

[24] Under 20 C.F.R. § 404.1520, if the ALJ weighs the evidence but "cannot reach a conclusion about whether [the claimant is] disabled," the ALJ should choose the best way to resolve the inconsistency, including (1) "recontact[ing] [the] treating physician" (2) request[ing] additional existing records (3) "asking [the claimant] to undergo a consultative examination," or (4) "aski[ng][the claimant] or others for more information." 20 C.F.R. § 404.1520b(c)(1)–(4) (Mar. 26, 2012). The regulation caveats that the ALJ "may choose not to seek additional evidence or clarification from a medical source if we know from experience that the source either cannot or will not provide the necessary information." *Id.* § 404.1520b(c)(1).

WL 4562978, at *17 (S.D.N.Y. July 21, 2015) ("[T]he alteration of the regulations does not give the ALJ free rein to dismiss an inconsistency without further developing the record."); *Ashley*, 2014 WL 7409594, at *4 (finding that, despite having broad discretion to resolve conflicts, the ALJ should have contacted and sought clarification from the treating doctor instead of finding that "[i]t was not necessary to contact either [doctor to] clarify their opinions as their treating records lack the documentation that they could point to [] support their opinions" (citing 40 C.F.R. §§ 404.1520b(c)(1), 16.920b(c)(1))); *Jimenez v. Astrue*, No. 12-CV-3477, 2013 WL 4400533, at *11 (S.D.N.Y. Aug. 14, 2013) (noting that despite the 2013 amendments, "the regulations still contemplate the ALJ recontacting treating physicians when 'the additional information needed is directly related to that source's medical opinion'" (quoting How We Collect and Consider Evidence of Disability, 77 Fed. Reg. at 10651)).

Failing to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding for further findings. *See Rosa*, 168 F.3d at 83 (finding remand "particularly appropriate" where the ALJ failed to obtain adequate information from treating physicians, and potentially relevant information for other doctors); *Green v. Astrue*, No. 08-CV-8435, 2012 WL 1414294, at *14 (S.D.N.Y. Apr. 24, 2012) ("[F]ailure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case." (citing *Moran v. Astrue*, 569 F.3d 108, 114–15 (2d Cir. 2009))), *report and recommendation adopted*, No. 08-CV-8435, 2012 WL 3069570 (S.D.N.Y. July 26, 2012). Nevertheless, even where an ALJ fails to develop the opinions of a treating physician, remand may not be required "where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013).

Here, the ALJ failed to properly develop the record before assigning little weight to the

opinions of Dr. Espinar and Dr. Lee. In assessing Plaintiff's RFC, the ALJ recited the findings

of Plaintiff's two treating physicians, which were produced in response to five- and six-page

questionnaires. (*See* R. 291–96, 309–14.) He correctly noted that both Dr. Lee and Dr. Espinar

diagnosed Plaintiff with osteoarthritis and osteoporosis, and that Dr. Lee found knee tenderness,

crepitus and decreased range of motion. (R. 24.) He noted that Dr. Espinar also diagnosed

Plaintiff with mild right carpal tunnel and hyperlipidemia. (*Id.*) He recited Dr. Lee and Dr.

Espinar's specific functional limitations as to Plaintiff's ability to sit, stand, walk, lift and carry,

and noted that Dr. Lee's findings changed between June of 2012 and September of 2012.

(R. 23–24.) Although the ALJ correctly acknowledged that "[Plaintiff's] treating doctors

indicate that she has significant functional limitations," he nevertheless assigned them "little

weigh because "the record contains no treatment notes or medical records from them to support

their conclusions." (R. 23–25.)

   In rejecting these opinions for lack of documentary support, the ALJ ignored his

affirmative duty to develop the record. The ALJ was aware of each treating physician's

diagnosis, but found that he could not assign them controlling weight because of a gap in the

record — the lack of notes or supporting reports. (R. 24.) However, having specifically

identified a relevant gap in the record, "the ALJ committed legal error in failing [to] develop the

record or seek clarification of the treating physicians' assessments before dismissing them as

inadequately supported by the clinical findings." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 278

(S.D.N.Y. 2010); *see also Perez*, 77 F.3d at 47 ("Because a hearing on disability benefits is a

non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the

administrative record.").

   The Commissioner asserts that the ALJ had no duty to re-contact any medical source

because he knew such attempts would be futile. (Comm'r Reply 5–6.) Even if the record supported such an argument, which it does not,[25] the best course of action was to re-contact Dr. Espinar and Dr. Lee to gather their supporting documentation or explanations for their findings. The record available to the ALJ clearly showed that Dr. Lee's "Residual Functional Assessment" followed at least four in-person examinations of Plaintiff, and relied on objective MRIs and X-rays of Plaintiff's joints. (R. 292–306, 308.) Similarly, the ALJ knew that before Dr. Espinar completed her "Physician's Report for Claim of Disability" in November of 2012, she had been treating Plaintiff since at least 2010 and, in that time, had referred Plaintiff to obtain images, reviewed imaging results and recommended a full knee replacement. (R. 264–65, 299–304, 309–11.) While the ALJ properly found these treating physician opinions "significant," he was unclear as to how the physicians reached their opinions. In such circumstances "the information needed pertain[ed] to the treating physician's opinion, [and] the ALJ should [have] reach[ed] out to that treating source for clarification and additional evidence." *McClinton*, 2015 WL 5157029, at *23. His failure to do so before assigning them "little weight" was error.[26] *Selian*, 708 F.3d at

---

[25] The record does not support the Commissioner's argument that the ALJ "kn[e]w from experience that the source either cannot or will not provide the necessary evidence." (*See* Comm'r Mem. 5 (quoting 20 C.F.R. § 404.1520b(c)(1)). The SSA contacted Queens Hospital twice in October of 2011 and once in November of 2011, over a year before Plaintiff's administrative hearing, but Queens Health Center "did not respond to [the] requests." (R. 274–75.) As stated in her disability findings, nearly all of Plaintiff's physicians worked at Queens Hospital. (R. 174–75.) Records from Queens Hospital physicians were ultimately included in the final administrative record. (*See* R. 175, 256–57, 299, 309.) Nowhere in his findings does the ALJ suggest that he failed to procure or attempt to procure the missing treating notes because he knew that Dr. Lee or Dr. Espinar would not produce them. Instead, the ALJ evidently placed the onus on Plaintiff, noting that "the claimant's attorney was specifically given the opportunity to produce such records post hearing." (R. 24.)

[26] This error was particularly problematic, given that both treating physicians reached markedly different findings from the consultative physician, whose opinion the ALJ assigned "considerable weight." (*Compare* R. 311–14 *and* R. 294–98 *with* R. 280.) Although the Court

421; *Jimenez*, 2013 WL 4400533, at *11.  Although a failure to develop treating physician's opinions may not be warranted in certain circumstances where the record is otherwise sufficient to assess the plaintiff's RFC determination, *see Tankisi*, 521 F. App'x at 34, as discussed below, the sparse available evidence supporting the RFC demonstrates that this is not such a case.

### ii.    The RFC assessment is not supported by substantial evidence

Plaintiff argues that the ALJ lacked substantial evidence to support a finding that Plaintiff retained the capacity for sedentary work.  (Pl. Mem. 15–16.)  Plaintiff further argues that the ALJ improperly relied on the opinion of consulting physician, Dr. Teli, whose report lacked any functional capacity assessments and thus could not contradict Dr. Lee's and Dr. Espinar's opinions.  (*Id.* at 14–16.)  The Commissioner argues that Dr. Teli was not required to specify each of Plaintiff's functional limitations, but the assessments could nevertheless be inferred from his report.  (Comm'r Reply 1–2.)

In determining the RFC of a claimant, "[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history." *Stover v. Astrue*, No. 11-CV-172, 2012 WL 2377090, at *6 (S.D.N.Y. Mar. 16, 2012) (citing *Mongeur*, 722 F.2d at 1037).  An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations."  20 C.F.R. § 404.1545.  With respect to a claimant's physical abilities, an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis.  *Id.* § 404.1545(b).  For example, "a limited ability to perform certain physical demands of work

---

takes no position on the accuracy of Dr. Teli's consultative opinion, it is worth noting that Dr. Teli found that Plaintiff had only a moderate limitation in squatting, whereas Dr. Espinar found that Plaintiff could never squat.  (*See* R. 295, 280.)

activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id*. "Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) (citing *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) and *Zorilla v. Chater*, 915 F. Supp. 662, 666–67 (S.D.N.Y. 1996)).

The SSA regulations direct consulting examiners to include information relevant to the RFC determination. *See* 20 C.F.R. § 416.919n (detailing the elements of a complete consultative examination report). Specifically, among the relevant information required for a consultative report is "[a] statement about what [the claimant] can still do despite [his or her] impairment(s)." 20 C.F.R. § 416.919n(c)(6). The regulations note that the SSA will "ordinarily request, . . . a medical source statement about what you can still do despite your impairment(s)." *Id.* However, the regulations further state that "the absence of such a statement in a consultative examination report will not make the report incomplete." *Id.* Indeed, "[t]aken more broadly, [these regulations] suggest remand is not always required when an ALJ fails in his duty to request opinions, particularly where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]." *Tankisi*, 521 F. App'x at 34 (citing SSA regulations expressly stating that the record may still be complete without a medical source opinion).

However, while an ALJ may, in some circumstances, proceed without a medical source opinion as to the claimant's functional limitation, there must still be "sufficient evidence" for the ALJ to properly make the RFC determination. *See Sanchez v. Colvin*, No. 13-CV-6303, 2015

31

WL 736102, at *6 (S.D.N.Y. Feb. 20, 2015) ("Significantly, the administrative record here is a far cry from that in *Tankisi* and similar cases, which have excused the ALJ's failure to seek a treating physician's opinion based on the completeness and comprehensiveness of the record."); *Downes v. Colvin*, No. 14-CV-7147, 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015) (noting that unlike *Tankisi*, "the treatment notes and test results from [the plaintiff's] treating physicians do not assess how [the plaintiff's] symptoms limited his functional capacities" and remanding for further findings); *cf. Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) ("*Given the extensive medical record* before the ALJ in this case, we hold that there were no 'obvious gaps' that necessitate remand solely on the ground that the ALJ failed to obtain a formal opinion from [the] treating physicians . . . ." (emphasis added)); *Tankisi*, 521 F. App'x at 34 (emphasizing the "extensive record" available to the ALJ).

Here, the record was not sufficiently developed for the ALJ to assess Plaintiff's RFC. At the outset, although Plaintiff seems to suggest that remand is warranted because Dr. Teli's report lacked detailed functional assessment, the regulations explicitly state that a record may still be complete absent such an assessment. *See* 20 C.F.R. § 416.919n(c)(6). However, absent such a determination by Dr. Teli, there must have been some record of Plaintiff's limitations on which the ALJ could have made his RFC determination. Citing *Samuel v. Comm'r of Soc. Sec.*, No. 13-CV-1939, 2014 U.S. Dist. LEXIS 163220 (E.D.N.Y. June 3, 2014), the Commissioner contends that such support could be inferred from Dr. Teli's report; however, that argument is misplaced.

In *Samuel*, the plaintiff claimed a disability due to a back injury, but the consultative examiner only found that the plaintiff was restricted from heavy lifting. *Id.* at *4. Reviewing the ALJ's determination, the district court found that, despite the short statement of limitations, the ALJ could draw the inference that the plaintiff had no other limitations because the examiner's

conclusion was based on a "very thorough report, testing and reporting on every aspect of the plaintiff's spinal dynamic ability and strength." *Id.* Here, however, no such exhaustive analysis of Plaintiff's degenerative knee or hip conditions occurred. Dr. Teli included general notes regarding, among other things, Plaintiff's stance and gait, the full range of motion in her hips and knees, and her use of a cane for balance, which Dr. Teli concluded, without explanation, was not "medically necessary." (R. 278–80.) Unlike the notes of the examiner in *Samuel*, Dr. Teli's notes do not recount testing of "every aspect" of Plaintiff's joints, such that the ALJ could draw an inference that Plaintiff had no limitations in sitting, standing, walking or carrying. Dr. Teli may have reached that conclusion, but unlike *Samuel*, absent Dr. Teli stating that Plaintiff had no other limitations aside from squatting, the ALJ could not merely infer that Plaintiff had no other limitations and insert his own conclusions in the place of Dr. Teli's. *See Hilsdorf*, 724 F. Supp. 2d at 347 ("[A]n ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error.").

Even considering the record apart from Dr. Teli's report, it is unclear where the ALJ could have drawn support for his specific functional limitation findings as to Plaintiff's ability to sit, stand, walk or carry things. Although Dr. Lee and Dr. Espinar made detailed functional limitation findings, as noted above, they reached substantially divergent findings from the ALJ and he assigned their opinions "little weight." (R. 24.) The record also included a functional capacity assessment, but the ALJ assigned "no weight" to this evidence. (*Id.*) The objective medical evidence provides no insight into any functional limitations, but did reveal osteoarthritis and osteoporosis. (R. 23–24.) Based on the lack of supporting functional limitation assessments, the ALJ's conclusions appear to be drawn from the absence of evidence in the record, and are

unsupported.  *See Rosa*, 168 F.3d at 81 (finding that the Commissioner was "precluded from relying on the consultant[ ] [examiner's] omissions as the primary evidence supporting its denial of benefits"); *Jermyn v. Colvin*, No. 13-CV-5093, 2015 WL 1298997, at *20 (E.D.N.Y. Mar. 23, 2015) ("[T]he ALJ was not permitted to construe the silence in the record as to Plaintiff's functional capacity as indicating support for his determination as to Plaintiff's limitations." (citing *Rosa*, 168 F.3d at 81)).  Given the ALJ's failure to develop the record as to the opinions of Dr. Lee and Dr. Espinar, and the lack of support for his assessment of Plaintiff's RFC, the Court vacates the Commissioner's decision and remands for further fact finding.[27]

### iii.  The vocational expert's testimony by telephone was harmless

Plaintiff argues that the ALJ improperly elicited vocational expert testimony by telephone, which resulted in difficulty cross examining the expert.  (Pl. Mem. 17–18.)  The

---

[27] Plaintiff argues that remand is also warranted because the ALJ improperly ignored evidence supporting Plaintiff's carpal tunnel diagnosis, specifically, the electro-diagnostic study of Dr. Vikas Varma, which revealed mild right carpal tunnel syndrome.  (Pl. Mem. 18–19; Pl. Reply 1–2.)  "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); *see also Fiedler v. Colvin*, 54 F. Supp. 3d 205, 218 (E.D.N.Y. 2014) ("[A]n ALJ 'is not required to discuss all the evidence submitted, and his failure to cite specific evidence does not indicate it was not considered.'" (quoting *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005)).  Here, the ALJ expressly noted that Dr. Espinar diagnosed Plaintiff with mild carpal tunnel syndrome, which would ordinarily be sufficient to support his findings.  (R. 24.)  However, because, as discussed above, the ALJ failed to "fully and fairly" develop the record, remand is still warranted.  *See McMahon v. Colvin*, No. 13-CV-4181, 2014 WL 3735910, at *10 (E.D.N.Y. July 29, 2014) ("While the ALJ need not recite every piece of evidence that contributed to the decision, the Court must still be able to 'glean the rationale of an ALJ's decision.'" (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)); *see also Cichocki v. Astrue*, 729 F.3d 172, 178 n.3 (2d Cir. 2013) ("An ALJ need not recite every piece of evidence that contributed to the decision, *so long as* the record "permits us to glean the rationale of an ALJ's decision'" (emphasis added) (quoting *Mongeur*, 722 F.2d at 1040)); *Pines v. Colvin*, No. 13-CV-6850, 2015 WL 1381524, at *4 (S.D.N.Y. Mar. 25, 2015) ("[*Brault*] did not alter, much less discuss, the long-standing rule that 'the Commissioner is required to provide "good reasons" for the weight she gives to the treating source's opinion.'").

Commissioner argues that such testimony was permissible.  (Comm'r Reply 6–7.)

The relevant SSA regulations in effect at the time of Plaintiff's hearing did not permit testimony by telephone.[28]  *See* 20 C.F.R. § 404.936(c) (June 19, 2013).  At that time, the regulations stated that the SSA "will consult with the administrative law judge in order to determine . . . whether your appearance or that of any other party who is to appear at the hearing will be made in person or by video teleconferencing."  20 C.F.R. § 404.936 (June 19, 2013).  Applying those regulations, courts have found legal error where an ALJ took testimony by telephone.  *See e.g.*, *Koutrakos v. Astrue*, 906 F. Supp. 2d 30, 35 (D. Conn. 2012) (finding the ALJ erred in taking telephonic testimony over the plaintiff's objection); *Edwards v. Astrue*, No. 10-CV-1017, 2011 WL 3490024, at *7 (D. Conn. Aug. 10, 2011) ("[T]he Court observes that the Commissioner committed legal error by not providing Ms. Edwards with notice that the medical expert would be testifying by telephone.").  However, as the Second Circuit has recognized, erroneously taking testimony by telephone may be harmless.  *See Henry v. Colvin*, 561 F. App'x 55, 58 (2d Cir. 2014) (holding that even if vocational expert's testimony by telephone was inconsistent with due process and SSA regulations at the time, it was harmless error, as the counsel raised no objection, and the record showed no technical difficulties or time constraints limiting counsel's effectiveness and plaintiff alleged no specific prejudice); *see also Palaschak v.*

---

[28]  Effective June 20, 2013, the SSA regulations were amended to allow a party to request an appearance by telephone and to give the ALJ discretion to allow such testimony by telephone if the ALJ determined that "extraordinary circumstances prevent [the witness] who makes the request from appearing at the hearing in person or by video teleconferencing."  20 C.F.R. § 404.963(c) (June 20, 2013).  Plaintiff's administrative hearing was conducted on November 30, 2012.  (R. 30.)  Accordingly, the Court considers the regulations in effect at that time.  *Henry v. Colvin*, 561 F. App'x 55, 57–58 (2d Cir. 2014) (evaluating the plaintiff's argument about expert testimony by telephone given the regulations "as they existed at the time of Henry's 2009 remand hearing"); *Lowry v. Astrue*, 474 F. App'x 801, 805 (2d Cir. 2012) (applying regulation in effect at the time the ALJ adjudicated the claim).

*Astrue*, No. 08-CV-1172, 2010 WL 1257895, at *5 (N.D.N.Y. Mar. 26, 2010) ("[T]he facts here do not support a finding of reversible error, since, as the R & R highlights, Palaschak's counsel was afforded a sufficient opportunity to cross-examine the VE and did so effectively.").

Here, the Commissioner concedes that at the time of Plaintiff's hearing, vocational expert testimony by telephone was not explicitly permitted by the regulations, but argues that the error was harmless. The record reflects counsel's surprise at the appearance of the vocational expert by telephone. (R. 56.) Counsel objected to the lack of notice regarding this vocational expert's testimony and to taking her testimony by telephone. (*See* R. 57–58.) At times during the expert's testimony, the record reflects that there were technical difficulties with the communication and that counsel had difficulty hearing the expert's answers. (*See* R. 58–61.) Despite these issues, the Court cannot find that, on its own, the testimony by telephone would warrant remand. Counsel vigorously cross-examined the expert, attempting to impeach her testimony and her credibility. (*See* R. 60–62.) Moreover, although counsel objected on the record, Plaintiff does not allege any specific prejudice arising from the telephonic testimony. Nevertheless, in light of the current regulations, on remand, the ALJ should give notice to Plaintiff of any telephonic testimony the ALJ plans to allow, so as to give Plaintiff an opportunity to object in accordance with the SSA regulations.

### III. Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied. Plaintiff's cross-motion for judgment on the pleadings is granted. The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 30, 2015
      Brooklyn, New York